# Commonwealth *versus* The Erie and North-East Railroad Company.

```
  27  339
 131   20
 131   22
 131   61
  27  339
 144  157
  27  339
 150   71
  27  339
 151  141
  27  339
 154  127
  27  339
 167   90
  27  339
 169  339
  27  339
 191  181
  27  339
 196  451
  27  339
a197   92
  27  339
20 SC 12259
  27  339
 204  1609
 204  2609
 204  1610
  27  339
d205  5 20
  27  339
 212  12131
  27  339
32 SC 8584
f 32 SC 2590
  27  339
f218  2273
  27  339
 222  3222
```

1. That which a company is authorized to do by its act of incorporation, it may do; beyond that, all its acts are illegal.

2. The powers of a corporation must be given in *plain* words or by *necessary* implication.

3. All powers not given in this direct and unmistakeable manner, are withheld.

4. A corporation can take nothing by construction.

5. The charter of defendants' company authorized them to build a railroad from the borough of Erie, then bounded south by Twelfth Street. The borough was subsequently extended farther south, afterwards the company built their road from a point within the enlarged borough, 60 rods south of the borough line, as it was at the date of their act of incorporation. *Held* that this was not a compliance with the terms of their charter.

6. The change of the borough lines did not in the least change the rights and obligations of the railroad company.

7. All laws must be executed according to the sense and meaning which they imported at the time of their passage.

8. The supreme legislative power may authorize the building of a railroad on a street or other public highway.

9. A company has the right to appropriate a street, only where the authority has been given by the sovereign power of the state.

11. If the powers given to a corporation cannot be executed without disregarding the restrictions with which they are coupled, they cannot be executed at all.

12. A charter of incorporation must be construed in favour of the public and against the grantees. *Contra* in a private deed.

13. When a railroad authorized to be made at one place is made at another, it is a mere nuisance on every highway it touches in its illegal course.

14. The act under which the borough of Erie was laid out, enacted that the "streets, lanes, and alleys thereof" should for ever be and remain public highways. The city councils could not by ordinance modify or repeal said law; they had no "legal power in the premises."

BILL in equity.

The bill set out that the respondents were a corporation under the Act of 12th April, 1842, entitled "an act to incorporate the Erie and North-East Railroad Company, and for other purposes." The act provides, *inter alia*, that the "president and managers of said company, by themselves or their agents, shall have power to construct a railroad from the borough of Erie to some point on the east boundary line of the township of North-East, in the county of Erie," &c.; also, that "the said railroad shall be so constructed as not to impede or obstruct the free use of any public road, street, lane, or bridge, now laid out, opened, or built," &c.; and also that "if the company aforesaid do not complete the said work so as to bring it into use within ten years after the passage of this act, or after completion shall suffer the road to go to decay

[Commonwealth *v.* Erie and North-East Railroad Company.]

and become impassable for the space of two years, then this charter shall become null and void."

. The bill then charges :—

1. That the respondents did not within ten years complete, nor have they yet completed the road from the borough of Erie to the east line of the township of North-East, but that the western terminus of their road is at a point sixty rods south of the borough of Erie.

2. That they occupy, cross, impede, and obstruct the public and established streets and lanes of the city of Erie, at points where they are not authorized by their charter to go, and in such a manner as to hinder and obstruct the travel on said streets, and that said road is a common nuisance, therein endangering the lives of citizens and destructive to property thereon.

3. That they have located and maintained their road upon and along what is known as the Buffalo road, in the township of Harbour Creek, for the distance of 80 rods in one place and 40 rods in another, to the exclusion of the public from the use of the same.

4. That they have contracted with and yielded up the control of their road to a foreign corporation, which they had no right to do. With a prayer for an injunction to prevent their occupying the road in Harbour Creek, or the streets of Erie.

5. The Act of 1795, under and by virtue of which the city of Erie was laid out, made an express dedication of the streets, lanes, and alleys to be "public highways for ever;" and neither the legislature nor city councils had any right to make an appropriation of the said streets, lanes, and alleys to a use inconsistent therewith.

To so much of the bill as claimed an injunction by reason that the said company have not duly completed their road within the time specified in their charter,—and for the reason that the road did not extend to the borough of Erie, as it was in 1842. And for entering into a contract with the Buffalo and State Line Railroad Company, respondents demurred.

· They admitted the chartering of the company, as charged; that they occupy the public streets of the city of Erie, and the public road in the township of Harbour Creek, but claim a right under their charter to do so, and deny that their occupancy constitutes a nuisance.

They admit that the "road never was constructed to what was in the year 1842 the borough of Erie;" that the borough of Erie subsequent to 1842, and before the building of their road, was enlarged, and its boundaries extended southwardly, and that they constructed their road to what was the borough or city of Erie in 1852, and claim that this was a compliance with the terms of their charter.

. They admit "that they have entered into a contract with the

[Commonwealth v. Erie and North-East Railroad Company.]

Buffalo and State Line Railroad Company," but deny that it was contrary to law, equity, or good conscience.

Examiners were appointed, and the testimony returned by them sustained the material allegations of the bill, in reference to the obstruction of the streets in the city of Erie, and of the public road in Harbour Creek township, Erie county.

*Thompson, Williams, Grant,* and *Griscom,* for the complainants.—The equity jurisdiction of the court extends to the restraint by injunction of "acts *contrary to law,* as well as prejudicial to the interests of the community, or the rights of individuals:" Hagner *v.* Heyberger, 7 *W. & S.* 104.

1. The bill in this case, charges that the company contrary to law, have located the western portion of their road sixty rods south of the borough, as it was when the act of incorporation was passed, and the charter issued,—and have not within ten years constructed their road as required by their charter.

2. That they occupy, cross, impede, and obstruct the public and established streets and lanes of the city of Erie, and have located and constructed their road, leading to the point where it enters the city, on ground not authorized by their charter.

3. And have located and maintained their road upon and along what is known as the Buffalo road, for the distance of 80 rods in one place, and 40 rods in another, to the exclusion of the public from the use of the same.

4. That they have yielded up the control and operation of the road to a foreign corporation, which they had no right to do.

These are the material points in the bill.

The act incorporating the defendants, is dated 12th of April, 1842: *P. L.* page 267.

By the 6th section of the act, it is enacted that the company "shall have power to construct a railroad *from the borough of Erie* to some point on the east boundary of the township of North-East, in the county of Erie." This is the New York state line.

The termini having been thus fixed by law, the railroad company was bound to adhere strictly thereto.

The proof establishes and the answer admits, that, in place of beginning at the borough of Erie, as it was when the act passed, the road was located and constructed 60 rods south of the borough as it was in 1842. There is no law to authorize the change.

The bill charges and the proof establishes, that the road crosses and obstructs the free use of Peach, State, French, Holland, German, Parade, Penn, and Ritner Streets, and Ash Lane, in the city of Erie. There is no grant of the right to the company to do so.

On these points the following Acts of Assembly and authori-

ties are cited to establish the want of authority in the company to locate their western terminus at the point they have fixed, or to enter upon, cross, or occupy the streets of the city.

By Act of 18th April, 1795, 3 *Smith Laws* 233–34, four thousand six hundred acres of land was ordered to be laid off in town lots for the town of Erie—and it was provided "that the land so surveyed shall respectively be laid out into town lots and out lots in such manner and with such streets not more than 100 or less than 60 feet, as the said commissioners shall direct," and "all the streets, lanes, and alleys thereof, and of the out lots thereto adjoining, shall be, and *for ever remain common highways.*" The town was laid out the same year, and all the streets crossed by the railroad above mentioned, were then laid out and established, except Penn and Ritner Streets, the former of which, the answer admits, was dedicated to public use before the railroad was constructed. They were both laid out by the owners of property adjoining thereto in 1850.

The laying out of the streets under the Act of 1795, was a dedication of them, in the most solemn manner, to public use, and it is questionable whether the legislature could revoke it.

" There is a manifest distinction between a dedication, and a mere reservation of land. The former is *irrevocable,* and the owner has no power or control over the property inconsistent with the terms of the dedication:" 4 *Sanford's Rep.* 608, Pitcher *v.* The New York and Erie Railroad Company.

But it is not necessary in our case to go this far, as the legislature have not revoked the dedication of the streets made by the Act of 18th April, 1795.

No implication can be allowed the effect of revoking the express grant of the streets to the public, or of extending the rights and powers of the railroad company over them in the absence of any express grant to that effect.

Neither does the act authorize the construction of the road into or across the borough of Erie, as it existed in 1842. The construction of charters is always strict. Nothing is implied by necessary incidents.

Section 10, of the Act of 19th February, 1849, gives the right to any company thereafter chartered to extend their road into any town or village where it is named as the terminus. This is a legislative construction that the right did not therefore exist: Augusta *v.* Earle, 13 *Pet.* 591 ; Commonwealth *v.* The Franklin Can. Co., 9 *Harris* 117 ; Bank of Kentucky *v.* Schuylkill Bank, 1 *Wh. Dig.*, 245 ; *Walford on Railw.* 64–5 ; 1 *Railw. Cas.* 591 ; 4 *Id.* 560 ; Blackman *v.* Glanmorganshire Can. Co., 1 *M. & K.* 162 ; Scales *v.* Pickering, 4 *Bing.* 448 ; 1 *M. & P.* 195 ; Barnett *v.* Stockton and Del. R. R. Co., 2 *Scott, N. R.* 337 ; *Shelford* 67.

[Commonwealth v. Erie and North-East Railroad Company.]

Thus it will be seen that the construction in the English courts is of the very strictest kind; the same rule obtains in the Supreme Court of the United States: Charles River Bridge v. Warren Bridge, 11 *Pet.* 543; Head & Amory v. The Prov. Ins. Co., 2 *Cranch* 127; Dartmouth College v. Woodward, 4 *Wheat.* 636; Bank of U. S. v. Dundridge, 12 *Id.* 64.

This same doctrine has been as emphatically announced and as firmly maintained by our own courts: Stormfeltz v. The Manor Turnp. Co., 1 *Harris* 560; The Commissioners v. The North. Lib. Gas Co., 2 *J.* 318. Ambiguity in the grant is always construed against the company, and in favour of the public.

There is no ambiguity in this charter. There is no authority to enter the town, and cross and occupy the streets. To begin at some point at the borough of Erie, means the borough as it was when the act was passed, and not as the city of Erie now is, with its extended limits.

The act is imperative and express that the "railroad shall be so constructed as not to impede or obstruct the free use of any public road, street, lane, or bridge now laid out and opened or built, nor to interfere with any burial-ground, dwelling-house," &c. These difficulties could all have been avoided by making the road to the harbour of Erie, and where the act contemplated it should be made.

The case of Dedrick v. Wood, 3 *Harris* 9, the prohibition against impeding the navigation of boats or rafts on a stream declared a public highway, is held to amount to a prohibition against impeding it as to any raft whatever.

The present location of the road, 60 rods south of the borough line as it existed in 1842, is without authority of law, and in derogation of the public rights.

This location, it is said, must be maintained because authorized by the corporate authorities of the city of Erie. But the last section of the ordinance referred to, expressly reserves the right to revoke the license, whenever the interests of the city might require it. And this right of revocation was exercised on the 28th Nov., 1853. Besides, the borough and city authorities had only power to improve and keep the streets, &c., in repair, for the purpose designed in establishing them. There was no power in the Councils to grant them away for another and different purpose: Rush v. The Commonwealth, 2 *Harris* 191; Gossler v. The Corporation of Georgetown, 6 *Wheat.* 593; Commonwealth v. Bowman, 3 *Barr* 206; Rung v. Shoenberger, 2 *Watts* 24; Lancaster Turnpike v. Rodgers, 2 *Barr* 114; State v. City of Mobile, 5 *Porter* 279.

*Stanton, Meredith, Hirst*, and *Campbell*, for respondents.—I. The termini of a railroad, or any other work of internal improve-

[Commonwealth *v.* Erie and North-East Railroad Company.]

ment, may be described by the legislature in general terms, or by fixed points. The terminus *a quo* of the Erie and North-East Railroad was not specially designated, but only described by a general term "*from the borough of Erie*."

These words are to have a reasonable construction in reference to the subject-matter and the public object of the grant.

The word "from" as terminus *a quo* is correlative to the word "to" as terminus *ad quem*, and may be taken inclusively according to the subject-matter : 1 *Stra.* 179–81.

The word "a" as a terminus *a quo*, and the word "*usque ad*" as a terminus *ad quem*, have been taken inclusively according to the subject-matter : 5 *Co.* 7, 103, 111; 6 *Co.* 62, 67; 1 *Vent.* 292; 3 *Keb.* 594; 3 *Leon.* 211.

The "borough of Erie," as the bridge in the case cited from Strange, was intended as a well known place, without intending its exterior line to form the limit.

In the case of the Farmers' Turnpike *v.* Coventry, 10 *Johns. Rep.* 388, the act of incorporation authorized the plaintiffs to make a road "from Troy to the city of Hudson," and prohibited toll-gates within three miles of either extremity. The road was made from Main Street within the city of Hudson, passing through the compact part of the city, and a toll-gate was erected over three miles from the junction, but within less than three miles from the line of the city. By an order of the Common Council of Hudson, the gate was declared a nuisance and thrown down. In an action of trespass, it was held that the road might commence within the city.

*Per Curiam.* The plaintiffs, by their charter, were entitled to carry the road "to the city of Hudson." This did not mean that the road was to terminate on arriving at the north bounds of the city, which are the middle of Major Abraham's creek, and several miles from the compact part of the city. The words are to receive a more reasonable interpretation in reference to the subject-matter, and the public object of the grant; which was to open a good road from *Troy* to the compact part of the city of *Hudson.* The words *usque ad* are sometimes to be taken inclusively, according to the subject-matter : 1 *Stra.* 179–81.

In like manner, the words commencing "at or near the city of Schenectady" were construed to mean at or *within the city* : The Mohawk Bridge Company *v.* The Utica and Schenectady Railroad Company, 6 *Paige's Ch. Rep.* 554.

To the same effect is the case of Smith *et al. v.* Helmer, 7 *Barb. Sup. Ct. Rep.* 416, where it was held that the word *from* in an act referring to the terminus of a work of public improvement, "must have a reasonable construction in reference to the subject-matter, and unless it is held to include some part of the village of Herkimer (one of the termini), the object of the grant, which

[Commonwealth v. Erie and North-East Railroad Company.]

was to construct a good road from the village of Herkimer for practical purposes, and therefore necessarily from the compact part of the village, cannot be accomplished.

While in criminal pleadings the word "from" has in some instances been regarded as exclusive, yet, when applied to the subject-matter here involved, and as denoting a notorious place, in reference to which a work of improvement is to be executed, it may seem the same as " in or within."

The rules for the construction of railroad charters in reference to the work to be performed, is the same as of turnpike companies and other works of public improvement. Although, in a certain sense, they may be said to be monopolies, yet they do not partake of the character of exclusive monopolies, but are favourably and liberally considered in reference to their objects and subject-matter : Philadelphia and Trenton Railroad Company, 1 *Whart.* 46 ; Stormfelz v. The Manor Turnpike, 2 *Harris* 555; The Mohawk Bridge Company v. The Utica and Schenectady Railroad Company, 6 *Paige's Ch. Rep.* 555.

This view is illustrated by the legislation in Pennsylvania. The first works of internal improvement were state roads and turnpikes. The termini of such roads and turnpikes were usually described as commencing *from* a town, city, or borough, and extending *to* some other town, city, or borough. The charters have invariably been construed as authorizing the company to commence from and proceed to some point within the town or borough limits.

It has never been claimed that the boundary lines of the place mentioned formed the terminus *a quo*, or the terminus *ad quem.*

In the construction of canals, the same phraseology was observed. And when the new method of improvement by railroads sprung up, the same phraseology was observed in respect to them.

Whenever it was designed to exclude the work from going within the borough or corporate limits, or that the boundary of the borough, or any definite point within it should be the terminus of the work, it was plainly so expressed.

For example, in the railroad from Philadelphia through Lancaster by Columbia to York, the terminus *ad quem,* is " the west end of the borough of York." So in the railroad from York through Gettysburg to Chambersburg, the terminus " *a quo*" is designated " from the west end of the borough of York ;" and likewise, in the road from Harrisburg through Carlisle to Chambersburg, " from a point at or near the west end of the Harrisburg bridge, through or near Carlisle to Chambersburg :" Act of 24th March, 1828.

In like manner the terminus *a quo* of the Portage Railroad, was designated " from the basin in Holidaysburg to Johnstown."

The terminus *a quo* of the Wrightsville, York and Gettysburg road, is fixed " at or near the west end of the Columbia bridge, in

[Commonwealth *v.* Erie and North-East Railroad Company.]

the borough of Wrightsville;" of the Harrisburg and Sunbury Railroad is, "from, at or near the terminus of the Harrisburg, Portsmouth, and Mountjoy road, in the borough of Harrisburg, to Sunbury, at or near the termination of the Sunbury branch," &c.

Numerous other instances abound in the legislation of this state. The General Railroad Act of 18th February, 1849, expressly declares "that all companies thereafter incorporated may commence *at* or *within*, and extend *to* or *into* any town, city, or village, named as the place of beginning and terminus of such road."

This act was merely declaratory of the law as it had always been understood and acted upon. It was only an embodiment into a general system of the provisions that experience and practice had shown to be wise, useful, and necessary in regulating railroad companies; consolidating and declaring the law as had been done in England, and· other states of the Union.

And hence, by the terms of their charter, the respondents were fully authorized to construct their road within the borough of Erie, if the state could confer such authority.

The power of the state to authorize the use of public streets and roads ƀy a railroad company is denied by the complainants, but is fully sustained by numerous authorities, of which the following only need be cited.

In the case of The Philadelphia and Trenton Railroad Company, 6 *Wharton* 25, it was held that the legislature may grant to a railroad company the privilege of laying rails on the streets of a city or town, and of using the railroad so made: 6 *Wh.* 43.

The same power was recognised in favour of a turnpike company, in the case of Stormfelz *v.* The Manor Turnpike Company, 1 *Harris* 559.

In Dake *v.* The Hudson River Railroad Company, 7 *Barbour* 509, it was held that

"A railroad is not *per se* a nuisance. Nor is the use of a street in a city, for a railroad track, in such a manner as not to abridge or obstruct the right of passage and repassage for other purposes, such an exclusive appropriation of the street as to amount to a nuisance, or a purpresture."

"Nor will the construction of a railroad through the streets of a city amount to an infringement of private rights, though the track should cause a slight change in the surface of the streets; provided the passage is left free and unobstructed for the public."

"It has been held, both in this state and in other states of the Union, that a railroad is not *per se* a nuisance: Hamilton *v.* The New York and Harlem Railroad Company, 9 *Paige*, 171; Lexington and Ohio Railroad Company *v.* Applegate, 8 *Dana* 289; 7 *Barb.* 551. The use of a street for a railroad consists merely in adapting its surface to a peculiar mode of conveyance; and when

so adapted, the running of a railroad car is no more an exclusive appropriation of the street than the running of any other species of conveyance would be."

The authority of the state to enlarge and extend the limits of the borough cannot be questioned.

This was done by the Act of 10th April, 1848. Within these enlarged limits the depot of the company was afterwards established, and the road extended.

But even if the company have not completed their road within the time limited by their charter, it is no ground of relief in this bill, and there is no prayer for relief upon that ground: *Sto. Eq. Pl.* §§ 41–44: and the only relief in equity would be an order to complete the road by extending it to the borough line.

II. 1. The second point alleges an obstruction to the streets of Erie, which must be fully established by the complainants.

The obstruction is denied by the answer. The complainant's proof shows no impediment or obstruction created by the construction of the railroad, but only exhibits inconveniences sometimes arising from the passage of engines, cars, and trains. This does not *per se* constitute a nuisance. If damage be done from an unnecessary noise or dangerous speed, such damage may be a cause of action. But the bill does not allege an improper use of the road as a ground of injunction. The gravamen of complaint in the bill, is the improper *construction* of the road, which is unsupported by proof.

The seventh section of the charter requires that " the said railroad shall be so *constructed* as not to impede or obstruct the free use of any public road, street, lane, or bridge now laid out, opened, or built; nor to *interfere* with any burial-ground, dwelling-house, or building, without consent of the owner."

The use of burial-grounds and dwelling-houses were protected from any *interference*, but roads and streets are only guarded against obstruction or impediment by the construction of the railroad.

This section implies the use of roads and streets alike by common travel and by the railroad, and contemplated the ordinary incidents of such locomotion, imposing no other obligation upon such use than the general rule of law, that each should observe the conditions necessary and proper for safety under such circumstances.

2. By the ninth section of the Act of 8th April, 1853, power was delegated to the corporate authority of the borough of Erie, " to improve, repair, and keep in good order, the streets, alleys, sidewalks, and public squares, and public grounds in said borough."

The council having this authority to improve, repair, and keep in good order, the plans of the company in respect to the location

[Commonwealth *v.* Erie and North-East Railroad Company.]

and construction of their depot, track, and buildings, were submitted to them, were approved by them, and license given; after which large sums of money were expended by the company. Although the power of withdrawing that license in respect to Penn and Ritner Streets was reserved, equity would require it to be exercised in a reasonable time, and before expenditures were incurred. The proof shows an acquiescence for nearly two years after expenditures were made, which would now be a great and irremediable loss to the company, and also that the withdrawal of license was an effort to compel the company to establish or maintain a gauge prescribed by the city. The license of the city, therefore, shows that the construction of the road upon the streets, and use by the railroad, was consistent with their improvement, repair, and good order, and favoured "public convenience and trade."

3. The condition of constructing the railroad so as not to obstruct or impede the free use of streets or roads, is to have a reasonable construction. An absolute freedom is not in such cases implied in respect either to highways by land or water. Otherwise the construction of railroads upon or over roads and streets would be impossible.

By "free use," is not to be understood a freedom from such partial obstacles and impediments as the best interests of society may render necessary : The People *v.* The Saratoga Railroad Co., 15 *Wend.* 113. The right to cross streets necessarily implies the existence of some impediment or obstruction, and the condition is only that the obstruction or impediment should not be inconsistent with such use of the street as the nature of the case may require. The terms of this charter are similar in substance with all other charters; in many instances, the same in form : Act to incorporate the Harrisburg and Pinegrove Railroad, March, 1842, *Pam. L.* 156; Act to incorporate the Pottsville and Tuscarora Railroad, 1840, *Pam. L.*; Act of 28th May, 1840 ; Act to incorporate the Bradford Railroad. It is also substantially the same as the provi- of the General Railroad Act of 1849 : *Dunlop* 1015, § 12.

Free use signifies nothing more than the lawful use, and does not exclude such limitations as may be imposed by the legislature to promote the general interests of society: *Walf. on Railw.* 183, § 240.

In the case of the King *v.* Edmund Pease and others, 1 *B. & Ad.* 30 (24 *E. C. L.* 17), it appears that—

" The railway was made parallel and adjacent to an ancient highway, and in some places came within five yards of it. It did not appear whether or not the line could have been made in those instances to pass at a greater distance. The locomotive engines on the railway frightened the horses of persons using the highway

as a carriage-road. On indictment against the company for a nuisance, it was held:

"The legislature, therefore, must be presumed to have known that the railroad would be adjacent for a mile to the public highway, and consequently that travellers upon the highway would be in all probability incommoded by the passage of locomotive engines along the railroad."

The Massachusetts Railway Act provided, "that if any railroad shall be so laid out as to cross any turnpike-road or other way, it shall be so made as not to obstruct such turnpike-road or way." The Eastern Railroad Company raised the Newbury turnpike three feet, so as to pass over at a grade on the same level. On a bill for injunction, it was held that the word "obstruct," in its ordinary sense, means to stop up or wholly prevent travel upon a road, or render it unfit for travel. That the section intended to provide against stopping up the road, and for its continuance by alterations in the road, which should increase the impediments and obstructions as little as possible: 23 *Pick. R.* 328.

III. The third point alleges an obstruction to the Buffalo road at Harbour Creek, by the location of the rails and crossing the road.

By authorizing the construction of a railroad from the borough of Erie to the state line, the authority to cross and occupy intervening roads so far as might be necessary for the purpose, was clearly implied; subject only to the condition of not impeding or obstructing such roads by the construction of the railroad. If the necessity of a straight line for safety, and its advantage to "the public convenience and trade," require proof, it is abundantly furnished by the respondent's evidence.

That cattle may frighten, or casualties occur from imprudence, or want of care or skill in those using the road by horses or steam, need not be questioned.

To that extent only does the complainant's proof go.

It is not controverted that the rails are laid at grade, the road well planked and gravelled, and such crossings were essential to avoid a curve; land has been purchased and dedicated by the company, and the road constructed so as to be straight, convenient, and secure; and that dedication has been accepted by the road commissioners of Harbour Creek.

By the road laws of Erie county, the charge and supervision of roads is delegated to three road commissioners, and it is shown by the proof, that the Harbour Creek crossing is made in accordance with the directions of the Harbour Creek commissioners.

As in a settled country, no railroad can be constructed without becoming contiguous or crossing established roads, the claim of complainant is inconsistent with the existence of any railroad communication. No effort is made to show the omission of anything

[Commonwealth *v.* Erie and North-East Railroad Company.]

in the construction of the road, that would render travel more secure at Harbour Creek.

The claim is, that the railroad should be removed, which of necessity involves an entire change of the route. No route is shown by complainant's evidence, that would not involve equal or greater difficulties in crossing the same or other roads. The defendant's proof shows any other route to be wholly impracticable.

In any view, therefore, a change at Harbour Creek involves the existence of the railroad.

The road was located in 1849, and used and occupied from that time without any legal proceeding or objection, until assailed in December, 1853, because of the lawful change of its gauge. In no instance has equity interfered under such circumstances against a company, but it has intervened to protect them against inequitable and harassing litigation.

IV. The allegation that by their contract with the Buffalo and State Line Railroad Company, the defendants " have yielded up the control and operation of the road to a foreign corporation," is a misconstruction of the terms and import of that agreement: It might as well be claimed that the Buffalo company had yielded up control of its road to the Erie company.

Both roads are links in a great line of communication, and the agreement imports an arrangement for the harmonious and economical running of the road under a joint superintendent. It is difficult to conceive what could better promote the safety of travellers, or more highly "*favour public commerce or trade*." Such arrangements are within the necessary powers of all railroad companies, and their details are to be regulated by the judgment and interest of the parties, in the absence of any positive or implied prohibition. No objection is assigned to any stipulation in this contract, save only that one of the parties is a "foreign corporation."

" A corporation may make any contracts that may be incidentally necessary to enable it to fulfil the purposes of its existence, or a usual and proper means to accomplish the purposes of the charter, if not forbidden by the charter or laws of the state :" *Angell and Ames on Corporations,* 192, § 12.

" It is well settled that, by the law of comity among nations, a corporation created by one sovereignty is permitted to make contracts in another, and to sue in its courts, and that the same law of comity prevails among the several sovereignties of the Union. The public and well known usages of trade—the general acquiescence of the states—the particular legislation of some of them, as well as the legislation of Congress—all concur in proving the truth of this proposition :" Bank of Augusta *v.* Earle, 13 *Pet. Rep.* 520.

[Commonwealth v. Erie and North-East Railroad Company.]

" The comity of a state, giving validity to contracts by foreign corporations is presumed from the comity of suit :" *Id.* 529, TANEY, Ch. J.

" The comity of suit brings with it the comity of contracts, and where one is expressly adopted by its courts the other must also be presumed, according to the usages of nations, unless the contrary can be shown :" *Id.* 596, TANEY, Ch. J.

" Comity of suit and contract exists in Pennsylvania :" 2 *Troubat and Haly's Practice* 147 ; 15 *S. & R.* 176.

No interest of the state is shown to be adversely affected by this contract.

The Buffalo road being a party to it, that company should have been made a party to the bill if any relief were sought against the agreement or its validity impeached.

The opinion of the court was delivered, September 7, 1854, by

BLACK, C. J.—This case requires us to give a construction to the charter of a private corporation. The frequency of such cases excites some surprise, when we reflect that an act of incorporation is and always must be interpreted by a rule so simple, that no man, whether lawyer or layman, can misunderstand or misapply it. That which a company is authorized to do by its act of incorporation, it may do ; beyond that all its acts are illegal. And the power must be given in *plain* words or by *necessary* implication. All powers not given in this direct and unmistakeable manner are withheld. It is strange that the attorney-general, or anybody else, should complain against a company that keeps itself within bounds, which are always thus clearly marked, and equally strange that a company which has happened to transgress them should come before us with the faintest hope of being sustained. In such cases, ingenuity has nothing to work with, since nothing can be either proved or disproved by logic or inferential reasoning. If you assert that a corporation had certain privileges, show us the words of the legislature conferring them. Failing in this, you must give up your claim, for nothing else can possibly avail you. A doubtful charter does not exist ; because whatever is doubtful, is decisively certain against the corporation.

If loss or injury comes to anybody in consequence of an ignorant disregard of this principle, it is not our fault. We have done all that in us lay to impress it on the public mind, and to warn corporations of the danger they might incur by disobedience. We enforced it to the utmost in The Bank of Pennsylvania v. The Commonwealth, Susquehanna Railroad Company v. Sunbury and Erie Railroad Company, The Pennsylvania Railroad Company v. Canal Commissioners, The Commonwealth v. The Franklin Canal Company, and in several other cases. All of our predecessors on this bench occupied the same ground. The doctrine is maintained

[Commonwealth *v.* Erie and North-East Railroad Company.]

by the Supreme Court of the United States, and in many states of the Union. Even in England, the justice and necessity of it are universally acknowledged and acted upon. But we do not mean to discuss the subject over again. The lawyer who is not already familiar with the numerous authorities upon it, to be found in every book of reports, will probably never become so; and the citizen who does not believe it to be a most salutary feature in our jurisprudence, would hardly be convinced though one rose from the dead.

Our duty in this case is, therefore, not a difficult one. If the words of the defendants' charter, understood in their ordinary sense, cover the acts complained of; or if there be a necessary implication of the power to do those acts, and nothing to forbid them, then this bill must be dismissed. But the defendants can take nothing at our hands by construction. We cannot widen the limits set to their privileges, because they have found them inconveniently narrow. We have no more right or authority to stretch an old act of incorporation than we have to make a new one. In either case, we would be usurping legislative power, and granting away from the state privileges which she has seen proper to withhold.

The bill complains—1st, That the Western terminus of the defendants' railroad is not where the act of incorporation requires it to be. 2d, That it is so constructed as to impede and obstruct the free use of certain streets in the city of Erie. 3d, That it also obstructs and impedes the free use of a public road laid out from Erie in the direction of Buffalo; and 4th, That the defendants have made a contract by which they have surrendered the control of their road to a foreign corporation.

I. The act of incorporation authorizes the defendants to build a railroad "*from the borough of Erie* to some point on the east boundary of the township of North-East." The defendants' counsel insist that the word *from* should be taken inclusively, and that a road from any part of the borough to the proposed *terminus ad quem* is a compliance with the law. On the other hand, the counsel for the plaintiff insist that it must begin at the borough line, and not elsewhere. Our opinion is with the defendants on this point, but we think the argument on it was rather beside the purpose, since the terminus of the railroad is neither at the line of the borough nor inside of it. Coming from the east, it passes the east boundary of the borough at a distance of sixty rods south, and runs on about —— rods further, in a direction precisely parallel with the south line of the borough, and there stops or connects with the road built by the Franklin Canal Company to the Ohio line. Certainly this is not a literal compliance with the act of incorporation. Making a road from a point selected by the defendants themselves sixty rods south of the borough, not coming

within that distance of the borough at any place, is not making a road *from* the borough eastward. Is there anything in the peculiar circumstances of this case which will justify us in treating this infraction of the law otherwise than as we treat similar violations of duty when committed by companies? We shall see.

What I have said concerning the borough of Erie, refers to what it was when the act of incorporation was passed. In 1848, and before the defendants' work was made, its limits were extended so as to include the place where the terminus of the railroad had been fixed. At a still later period, the borough was incorporated as a city. But we are very clear that this alteration of the borough lines did not in the least change the rights or obligations of the railroad company. All laws must be executed according to the sense and meaning which they imported at the time of their passage. A line which did not exist until 1848, could not have been in the mind of the legislature in 1842. The modifications made in the charter of the borough left the defendants' charter just where it was before. The amendment of one is not to be taken as a supplement to the other. If " the east boundary line of North-East township" had been shortened or obliterated, or differently named by an Act of Assembly passed in 1848, the defendants would have understood very well that their right to locate the eastern terminus on any part of the township line as it existed in 1842, was not thereby altered or taken away. The law commanded the defendants to begin their railroad at the borough of Erie as it then was, and that command is in full force notwithstanding the change which has been made in other matters.

Is this violation of the charter so trifling that we can overlook it on the principle of *de minimis?* The counsel of the company have not argued that it is—and certainly it is not. The place at which the terminus should be established being precisely and particularly designated by the act of incorporation, in words which rendered mistake impossible, all other places, whether near or far, are as surely excluded as if they had been expressly forbidden. If we cannot hold companies to a strict compliance with their charters, we cannot hold them at all. In some situations (and, for aught we can see, this may be one of them), the purpose and object of allowing the road to be built can be as completely defeated by a deviation of sixty rods as sixty miles. The directors must have thought that they could gain a point of great value to them by changing their terminus, or else they certainly would not have ventured upon it in the teeth of the law. And they must have been conscious, too, that the legislature had some important reason for confining them to the borough, or else they would have sought and got an amendment to their charter. This railroad was probably intended as an outlet to New York for the lake trade of Erie. It could not have been meant as a link in the connexion between

Buffalo and Cleveland, for there was not then any authority given to this company or any other to build a road westward from Erie to or towards the Ohio line. Its actual location puts it beyond the reach of the lake trade, being one hundred and ten feet above and three-quarters of a mile distant from the harbour. It connects itself there with a road to Ohio built in violation of law, and by a fraud which has already received its condemnation. By this means it has become part of a continuous line from New York to the West, carrying goods and passengers not to the borough of Erie, but quite around and past it. I mention this merely as showing that the general scope of the law, as well as its literal words, has been disregarded. It is suggested, however, as a mere probability. We do not know nor care what the purpose of the state may have been. But one thing we do know—and that is enough —that the board of directors had no right to substitute their will for the plain requirement of the law. If the fair interests of the stockholders,—if the accommodation of the neighbouring people,— if a due regard for the commerce of the whole country,—if a magnanimous liberality to the citizens of adjoining states,—if these considerations, or any one of them, required an amendment of the charter, the managers should have asked the proper authority of the government to make it. Assuredly there is no legislative body on the face of the earth to whom such an appeal, if well grounded, could be made with more certainty of success than to the General Assembly of this state.

II. The right of the supreme legislative power to authorize the building of a railroad on a street or other public highway is not now to be doubted. It has been settled not only in England (1 *Barn. & Ad.* 30), but in Massachusetts (23 *Pick.* 328), New York (7 *Barb.* 509), and in Pennsylvania (6 *Whart.* 43). If such conversion of a public street to purposes for which it was not originally designed, does operate severely upon a portion of the people, the injury must be borne for the sake of the far greater good which results to the public from the cheap, easy, and rapid conveyance of persons and property by railway. The commerce of a nation must not be stopped or impeded for the convenience of a neighbourhood. But we can say this only in cases where the authority has been given by the sovereign power of the state. That any private individual or incorporated company, not empowered to do so by an act of the legislature, can take possession of a street and make a railroad upon it without being guilty of a criminal offence, is a proposition which I am sure no lawyer would dream of making. The right of a company, therefore, to build a railroad on the street of a city, depends, like the lawfulness of all its other acts, upon the terms of its charter. Of course, when the power is given in express words, there can be no dispute about it. It may also be given by implication ; for instance, if a company be authorized to

[Commonwealth v. Erie and North-East Railroad Company.]

make a railroad, by a straight line, between two designated points, this implies the right to run upon, along, or across all the streets or roads which lie in the course of such line. So also when an act of incorporation directs a road to be made between certain termini, by such route as the grantees of the privilege shall think best, it may be located on an intervening street or other common highway, if in the judgment of the directors it be necessary or expedient to do so. But when an act of incorporation authorizes the making of a railroad which it is not possible to make without using the streets of a town for part of it, still such streets cannot be so used if the same act of incorporation forbids it. If the powers given to the corporators cannot be executed without disregarding the restrictions with which they are coupled, they cannot be executed at all. In a private deed, an exception as large as the grant, is void because private deeds are construed most strongly against the grantor. But a grant of privileges by the state, to a body of adventurers, must be construed precisely the other way—in favour of the public and against the grantees. A prohibition, exception, or reservation in a charter, must therefore stand in full force, though it destroy or make nugatory all the powers given to the company.

The act of incorporation now before us, contains the following very emphatic clause: " The said railroad shall be so constructed *as not to obstruct or impede the free use* of any public *road, street, lane, or bridge,* now laid out, opened, or built, or to interfere with any burial-ground, dwelling-house, or building without the consent of the owner." It would certainly strike most men upon the first look, that a railroad company with such a provision in its charter is on dangerous ground when it takes possession of a street. It is not at all easy to understand how the people of a city can have the use of a street free from obstructions and impediments, when the street is of ordinary width, and has two railroad tracks upon it, along which locomotive engines, with trains of cars, are running every five minutes of the day. Nor is it by any means impossible, that in this case the legislature intended to exclude the company altogether from the streets, even at the risk of having no railroad made; for the desire to preserve to the people of Erie and its neighbourhood the free use of their streets and roads, may have been stronger than the wish to establish a railway communication for them with New York.

An obstruction is anything *set in the way,* whether it totally closes the passage or only hinders and retards progress. A road may be obstructed more or less. The word impediment is almost synonymous with obstruction, except that it is seldom, if ever, used to signify an entire blocking up of the way. It is an obstacle—not an impassable barrier. To understand these words in their ordinary import, and then say that a railroad is not *per se* an obstruc-

[Commonwealth *v.* Erie and North-East Railroad Company.]

tion or impediment to the free use of a street by the public, is rather more than I can do. But perhaps it is not quite safe to interpret them according to their popular sense. Certain it is that they have sometimes been otherwise used in Acts of Assembly. A law of Massachusetts provides, that "if any railroad shall be so laid out as to cross any turnpike or other way, it shall be so made as not to *obstruct* such turnpike or way." It was decided (23 *Pick.* 226), that this did not prevent all interference with the road, but required only that it should cause the least possible inconvenience or impediment. By a statute of this state, enacted in 1803, the owners of lands adjoining navigable streams were permitted to build dams, provided that such dams should "not *obstruct* or *impede* the navigation of such streams, or prevent the fish from passing up the same." This court (4 *Watts* 440) declared, that if these words were taken literally, the owners could not avail themselves of the privilege at all; but as this construction would have been contrary to the grant itself, a more liberal one was adopted, and a dam which did not *materially* hinder the navigation was held not to be within the prohibition. Although the reasoning of these cases does not altogether fit the one before us, they are entitled to much weight. They are decisive, indeed, of one thing which is important, namely: that the words in question may sometimes have a legal signification different from that which we would otherwise have been disposed to assign them. For the sake of consistency we must follow in the steps of those who went before us, though it be true that the track is not very clearly marked.

Let it then be conceded as a possible thing, that a railroad can be so constructed on a public street that it will not be an obstruction to its free use; that such railroad is not in any sense a nuisance *per se;* that a street may be occupied in common by a railroad and the public without any such inconvenience to the latter as will amount to an impediment, or abridge the freedom of its use for ordinary purposes: still it is not true (as the converse of the argument would make it) that the street is unobstructed as long as travel upon it is not entirely prevented. If it be proved that a man may squeeze himself along beside the track, or dodge across at the peril of his life, it does not follow that the use of the street is free, unobstructed, and unimpeded. We hold, therefore, that under a charter like this, a railroad cannot be built on a street in such a manner as to cause any *material* obstruction. If we assume, as we do, that the clause under consideration does not entirely forbid the company from going on any street, we must also allow them to create such impediments as cannot be avoided. But those which are not absolutely *necessary* to the making and using of the railroad, are unlawful; for managers are bound to leave the street as nearly free from obstructions as they can, and for that purpose to spare no reasonable expenditure of money or

[Commonwealth *v.* Erie and North-East Railroad Company.]

labour. If, for instance, the railroad be made above the level of the street, they must grade the rest of the street also, if that will make it better for the public accommodation. They cannot say to the city authorities, We have destroyed your street, and rendered it impassable; but we have not impeded its free use, because you can restore it again to a tolerable condition, at your own expense. Neither does it make any difference whether it be a main thoroughfare or an unimportant by-street, for this act of incorporation protects all alike.

We have attentively considered the bill, answer, and evidence in the cause, and they satisfy us of the following facts: 1. A considerable portion of one street within the present limits of Erie city is occupied almost entirely by the railroad in a manner which makes any considerable use of it for other purposes almost impossible; and this is true, although the defendants themselves say that the street might be safely and conveniently used if it were properly graded—a duty which they left unperformed. 2. Two streets are crossed by the railroad on bridges, which are too low and too narrow for large wagons passing one another, or for a single wagon with a bulky load. 3. Two other streets are crossed on an embankment, considerably above grade, with a ditch on each side, and thus all passage along those streets, by any kind of vehicle, is as completely stopped as it could be by a stone wall twenty feet high. All these things are illegal, for the reasons given. That some of these streets are on low, wet ground, and little used, might be a sort of apology for the defendants, if we were sitting here to take excuses for the violation of the law. But that is no part of our duty.

A large part of the evidence refers to the danger encountered by persons obliged to cross the railroad when trains were approaching, and the delay and inconvenience caused by cars, which totally blocked up the crossing places. If the defendants have a right to make the road on a street, they have also the right to use it when made. They may carry all the freight and passengers they can get. If the number of cars and locomotives necessary to do their business be so great as sometimes to choke the thoroughfares over which they pass, it must be remembered that the same thing would happen in a much greater degree, if the twentieth part of the business were done in carriages, coaches, and common road wagons. If the cars are suffered to stand for an unnecessary length of time, at places inconvenient to the public, the act is indictable as a nuisance, and for any want of proper care, the defendants are liable in damages to the persons injured by it. But it cannot be said that they have violated their charter in causing obstructions of this kind, unless such obstructions could have been prevented or diminished by a different construction of the road.

Under other circumstances, the voluminous body of evidence laid before us might require a much more extended discussion. But we are content with the compendious reference we have made to it, because every inch of this railroad which lies upon any street of the city is unlawful, at all events. If the defendants had begun their railroad at the place designated in their act of incorporation, they would not have interfered with any of the streets mentioned in the bill, except Ash Lane, and that would have been crossed at a different place. When a railroad authorized to be made at one place is made at another, it is a mere nuisance on every highway it touches in its illegal course. The streets in question, not being on any route which the defendants were authorized to take, they are on them in disobedience of their charter, and all they have done there is without the shadow of authority. It is useless, therefore, to inquire how much of the inconvenience complained of might have been avoided by a better construction. It is enough to say that the railroad has no business at all to be where it is.

It appears that the city authorities gave their consent to the use of the streets, and to the location of the railroad on the ground which it now occupies. This privilege was given " so far as the mayor and councils have legal power in the premises," upon condition that the railroad should cause the least possible obstruction to the ordinary travel and business of the streets, and with a reservation of the right to withdraw the privilege whenever it should appear to the councils to be injurious to the interest and welfare of the city. The condition was broken, and the privilege was revoked. But if the resolution of the councils had remained in full force up to this time, it would have been of no avail here. They had no "legal power in the premises." An act of the legislature cannot be repealed or modified by the ordinance of a city corporation. What the defendants did in disregard of the law was no less an offence against the rights of the public, because the city was in some sort *particeps criminis.* If both had persisted in it, the Commonwealth's duty would have required her to see that the rights of her citizens were vindicated against both.

III. It is alleged and proved, and not denied, that the railroad has been laid down on and along a public road, called the Buffalo Road, in such a way, that for some distance it cannot be, and is not, used by the public at all, but on the contrary, that portion of the people who would otherwise travel thereon are obliged to take another way, which the railroad company has opened for them. Of course, this is within the prohibition against obstructions and impediments to the free use of public highways. The answer to this charge is not based on any interpretation which the charter is thought to be capable of. Other grounds are taken. One defence is, that the railroad could not be made in a straight

[Commonwealth *v.* Erie and North-East Railroad Company.]

line without taking a part of the Buffalo Road. We can only say, that if a railroad cannot be made straight without violating the law, it must be made crooked, or not made at all. Equally baseless (even if true) is the other argument, that the public has suffered no injury by this act. Those public interests which lie outside of the defendants' charter are not committed to their keeping. The legislature has thought proper to guard the right of the people to the free use of their own roads, by enjoining the defendants not to impede or obstruct them. This injunction it was wrong to disregard, even for the sake of a supposed public benefit. The people have rejected the boon which the company tendered them, and the state, *parens patriæ* now demands for them the rights which are secured and reserved by her own laws.

IV. The charge that the defendants have, by contract, surrendered the control of their road to a foreign corporation, was but faintly pressed in the argument. We do not consider the contract illegal, and if our opinion were different, we would withhold it until all the parties could be brought before us.

This disposes of the principal allegations in the bill. But aside from these there are one or two matters suggested by the defendant's counsel, which ought not to be passed without a remark.

They have argued that no decree could be based on obstructions created by the *use* of the railroad, because the act of incorporation provides only against the road being so *constructed* as not to impede, &c. And the bill charges nothing else. Whatever impediments are caused by the ordinary and proper use of a railroad we attribute to its construction, if such impediments could have been avoided by a different construction. The legislature said to the corporators, you may make a railroad between certain given points, and use it when made by running cars and steam-engines on it; but you must so make it that its existence and use in this way will not impede the travelling on any highway now laid out. The railroad is so made that locomotives cannot be used on it without impeding travel on a certain highway, previously laid out. Such a railroad is not constructed according to the law. If it were, the use would be proper enough.

The defendants' counsel have made another point which it is right to notice. It is said that though this proceeding is conducted in the name of the state, its real object is to redress a supposed injury, which is private, or at most merely local, in its character. We are urged to look not at the flag, but at the parties who fight under it. These parties—the public authorities of Erie, and the people of the neighbourhood—encouraged the defendants to expend large sums of money in building the railroad, and the attempt which they are now making to break it up, is denounced in the argument as an act of wanton injustice. The only party before us is the Commonwealth. We do not even know the names of the

[Commonwealth *v.* Erie and North-East Railroad Company.]

other persons alluded to. The Commonwealth complains in due form by her accredited legal representative, the attorney-general, that one of her corporations has violated its charter. We have investigated the case and found the complaint to be true. The delinquent corporation cannot justify itself by showing that in the commission of the wrong it received aid and comfort from other persons. If the mayor and councils of Erie, or their constituents, connived at this breach of law, they were guilty of a sin, for which their best excuse is that they seem to have repented of it, and are now disposed to assist the state in bringing the other offenders to the same wholesome state of mind. It cannot be that the defendants were *misled* by the people or their officers, for they must have known that a city ordinance could not authorize what an act of the legislature forbade. No laches can legally be imputed to the Commonwealth, and in point of fact, she has been guilty of no unfairness. She spoke her will plainly in the act of incorporation, and gave it to the defendants to be a guide to their feet and a lamp to their path. They disregard it. The attorney-general proves the fact, and stands up for judgment. We cannot refuse what law and equity demand.

DECREE.—This cause came on to be heard before the Supreme Court, on the bill of complaint, on the answer of the defendants, and on the proofs and evidence taken by both parties, and was argued by counsel; and thereupon it appears to this court that the defendants have built, and do now use and maintain a certain railroad, known as the Erie and North-East Railroad, of which said railroad a part is within the present limits of the city of Erie, and upon certain streets thereof, and another part is upon the bed of a certain public road, known as the Buffalo road, in Harbour Creek township, Erie county; and that the said railroad in those parts thereof, is a public and common nuisance. It is, therefore,

Ordered, adjudged, and decreed, that the defendants shall, on or before the expiration of four months from this date, break up so much of their said road as lies upon the said streets, and upon the Buffalo road, and remove the materials thereof, so as to leave the said streets and road in as good condition as they were in before the construction of said railroad.

And it is further declared and adjudged, that the said defendants are bound to make the borough of Erie, with such limits as it had in 1842, the western terminus of their railroad. It is therefore decreed and ordered, that the said defendants shall, within four months from this date, change the route and construction of their railroad accordingly, and make their western terminus at what was the eastern

[Commonwealth v. Erie and North-East Railroad Company.]

line of the said borough in 1842, or within the same borough. And the said defendants shall re-construct their railroad to supply the parts hereby ordered to be broken up, according to plans and specifications to be by them made, and to be submitted to and approved by this court, on full notice to the counsel of the Commonwealth, and not otherwise. And the defendants shall pay all lawful costs, to be taxed by the prothonotary.

Lowrie, J.—I concur in nearly every part of the opinion read by my brother, the Chief Justice, and in the decree that is about to be pronounced, and it would have afforded me great pleasure to have had the concurrence of my brethren in pronouncing one more stringent in its requisitions.

The defendants were incorporated in 1842 to make a railroad from Erie to the state line on the east, and it is very plain that the sole thought that was in the mind of the legislature, in incorporating it, was to provide a means of commercial connexion between the harbour of Erie and the state of New York. It is very plain, also, that this company has turned almost entirely aside from this purpose to one that was not at all intended, and, with the aid of that fraudulent concern, the Franklin Canal Company's road, they have carried out their own main purpose of forming a connexion between Ohio and New York, and have converted the intended and proper terminus of their road into little better than a water station.

And in the course of their proceedings, they have shown very little regard to the public authorities of the state. Contrary to law, and in violation of the express orders of the road commissioners, they took possession of a part of the Buffalo or Ridge road, and used it according to their own will. And much of the same disregard of the public authorities has been exhibited in their relations with the public officers of the city of Erie. Though a mere private corporation, and operating for the purposes of gain, they seem to have assumed that the regular local authorities must stand aside for them, as if in the presence of their official superiors. I discover very little palliation for their errors, and should have been willing to allow them much less indulgence in the mode of retracing their steps.

I am sorry that my brethren think that when an incorporated town or city is made the terminus of a railroad, the company has, by implication, a right to carry their road to any point within the town or city, and along any of its streets that they may choose, and this without being at all subject to the direction or restraint of the local authorities. I should have been pleased to have the concurrence of my brethren in a contrary doctrine. It seems to me that this is giving to mere private corporations or associations a superiority thus far over those public functionaries to whom the

[Commonwealth *v.* Erie and North-East Railroad Company.]

interests of the public are intrusted, and this, too, by no necessary implication.   It seems hard enough to have to make such an implication in relation to a town or city that lies between the termini.

Let it be called illiberal to break the connexion between this road and the western one.   This is a matter not for us, but for the legislature to consider, and perhaps they have done so.   It is not impossible that we may allow the cry of illiberality to drive us into a Quixotic and impracticable cosmopolitism.   State pride, state enterprise, patriotism, is selfishness; but it is the very form of selfishness that is at the bottom of all national glory.   I trust that it is not to be frittered away by the mere American feeling, which is always tending to obliterate the local and more effective feelings out of which our present liberties grow, and upon which they depend.

KNOX, J., concurred.

· LEWIS and WOODWARD, Js., dissented.

At the sitting of the Supreme Court in Erie, in September subsequent to the making of the foregoing decree, plans and specifications for the change of their road in Erie and Harbour Creek, in pursuance of said decree, were presented by defendants to the court and their approval moved.

The counsel for the Commonwealth filed the following exceptions:—

1. That the plan proposed for the change of route in Harbour Creek, only proposes a partial removal of the railroad from the Buffalo road, leaving one portion of the last-named road occupied by the railroad as it was prior to the decree.

2. That a location of the railroad should be north of the Buffalo road, and not south of it, as proposed.

3. That the proposed location at and within the city, will obstruct the streets of the city, and will entirely occupy Twelfth Street to Millcreek with turnouts, switches, &c., and as the population of the city increases, will greatly and injuriously interfere with the trade, commerce, and business of the city.

4. The proposed terminus will be on Twelfth Street, within the old borough limits, at which point defendants' water stations, &c., must be erected, which will *necessarily* obstruct and almost exclusively occupy the same, contrary to the decision of the court and the prohibition contained in the charter of said company.

5. The said railroad should be located and constructed to the harbour, whence it could be taken without obstruction to the streets of the city, and where an authorized connexion with the Western Road can be made as soon as the same may be constructed to said point, by the Erie and North-East Railroad.

6. The harbour of Erie is the legal point to which the railroad should be carried.

[Commonwealth v. Erie and North-East Railroad Company.]

And the case was afterwards argued at Pittsburgh; and the court thereupon rendered the following opinion and decree:—

BLACK, C. J. —The bill in this case complained that the Erie and North-East Railroad Company had violated its charter. We heard the case fully and I may add ably argued by counsel on both sides, at Philadelphia, in July. We held it under advisement until our meeting here in September, and then gave as the result of our deliberations, an opinion that the charter had been violated by the company. It seemed to us too clear to admit of doubt that the allegations of the bill were sustained in these particulars, namely: 1. The defendants were bound by the act of incorporation to make their western terminus at or within the borough of Erie as it was in 1842; whereas it was fixed sixty perches southward of the south line. 2. Even if its location southward of the old borough had been in itself lawful, it would have been rendered unlawful by the manner in which the streets of the city were impeded and obstructed. 3. The railroad occupied the Buffalo road in such manner as to make it useless and impassable, in direct contradiction of the charter. The decree which followed this opinion could do nothing less than require the road to be taken up at those places where it was adjudged to be illegal, and reconstructed in such manner as to conform to the requirements of the charter. We made such a decree, and there we might have stopped. In strictness our duty would have been done by simply commanding the defendants to re-locate their road so as not to violate the act of incorporation again, and leave them to disobey it if they dared to encounter the peril of doing so. We were not bound to tell them beforehand what new location would be lawful and what unlawful. But it was plain that a dispute like this could not be so settled. The company might commit another error, and if they did not, the attorney-general might suppose they did. In either event the contest would be renewed, and misconstruction of the charter would be made worse by misapprehension of the decree. For these reasons it was thought best that we should order the plan of reconstruction to be submitted to us before it was executed, giving to the counsel of the state the right to be heard in opposition; so that when it was approved the company might proceed in security, and the objection of all other parties be silenced so far as the authority of this court could silence them.

In pursuance of the decree a plan has been submitted by the company which the counsel for the Commonwealth object to in strong terms, and insist that the company should be compelled to make the road according to another and a widely different plan prepared under their direction. The principles by which we are

to settle this question are very plain. We sit here as a judicial tribunal to administer justice according to the law of the land. The charter of this railroad company is a part of this law, made on purpose to define the rights and obligations of all parties in this business. Because the defendants got outside of the charter, we commanded them to repair their error cost what it might. We listened to no remonstrance grounded on the loss and trouble which it would occasion them. Their plea of policy and public benefit in opposition to law was summarily set aside. All their excuses based on considerations outside of the legislative act which gave them a corporate being were utterly disregarded. We would hear of nothing but the charter then, and we can hear nothing else now. We must give the defendants the same measure of justice that has been meted out against them. The representatives of the Commonwealth "stood up for justice and her bond;" and we awarded her all that we found nominated there, when we adjudged the defendants to have transcended their charter, and decreed that they must bring themselves within it. We will not go behind or beyond that decree, but standing directly upon it, we declare again, that if the defendants comply with their charter, we think it strange that the attorney-general or anybody else should complain of them.

The act of incorporation requires this road to be made "from the borough of Erie." This is obeyed when the road is made from any part of the borough. If the legislature had designated a particular spot as the *terminus a quo*, we would have ordered it to be made there. But the decree is, what it ought to be, exactly as broad as the charter, and not broader or narrower. They must start at or within the borough. By the plan before us they propose to do so, and this brings us to the point where our control of them ceases. If they had done this at first we could not have disturbed their location, and it will hardly be denied that what would have been lawful then is equally lawful now. That a company which is authorized to make a road from *any* part of a borough may make it from *one* part as well as *another* is so mere a truism that one hesitates to utter it. The discretionary right of fixing the terminus at a definite point within the limits assigned is vested by the organism of this company in the directors. We have it not. We cannot resolve ourselves into a board of directors, nor can we delegate the authority of such a board to the attorney-general and his assistant counsellors. We approve the plan laid before us by the defendants, so far as concerns the location of the terminus, because it does not appear to conflict with any law; and whatever may be our private preference for the other plans, we cannot force them on the company, simply because neither we nor the persons who made them have the legal power to do so. To all the arguments derived from the commercial interests of Erie

[Commonwealth v. Erie and North-East Railroad Company.]

and of the state, we give a full answer when we say that we are here to pronounce the law and not to settle questions of policy or trade. If we had any ambiguous charter before us, equally capable of two different constructions, one beneficial and the other injurious to the public trade, we would prefer the former as being most probably the true intent of the legislature. But that is not this case; for here the charter is not in the least doubtful.

Another objection to this location is more grave, because it bases itself on a provision in the act of incorporation. It is said that the streets would be less obstructed by taking the road down to the harbour than by locating it where the defendants propose. The company is forbidden to make the road so as to obstruct or impede the free use of any street. These words, taken literally and in their strongest sense, would prevent the railroad from being made on the streets at all. But we followed authority in saying they were not to be so interpreted. The defendants have the right to use a street if they take care to obstruct it as little as the nature and character of their improvement will permit, if they create no material or unnecessary impediment—no obstruction which could be avoided by any reasonable expenditure of money or labour. They cannot occupy the whole of a street and drive the public away from it altogether. But any street which is wide enough for the railroad and the public both, may be used on the terms mentioned. This applies to all the streets—to those on the south as well as to those on the north side of the borough—to streets already built up, and to such as are laid out with reference to the future growth of the town. The defendants in their answer attempted to justify their occupancy of some of the streets by showing that they were wet, low, and little used. But we allowed this to have no legal weight whatever, and added that it made no difference whether it was a main thoroughfare or an unimportant by-street, for this act of incorporation protected all alike. Having administered this rule against the defendants, it cannot be that we are seriously expected to deny them its benefit now when it works in their favour. Their duties and the rights of the public being the same in all the streets, we cannot force them out of one and into another. Nor can we compel them to take their road where no streets are; for the privilege of locating it on streets, if certain conditions be observed, is granted to them by the charter.

A part of this railroad is laid upon and occupies the very bed of the Buffalo road in Harbour Creek township. The defendants propose to take up a part of it and to leave another part, about 800 feet in length (which equally interferes with the Buffalo road), where it is. We cannot see how any distinction is to be made between those two portions of the railroad. There is in fact no material difference. At both places the public travel is so obstructed that it is turned away altogether. At one the company

has made a new road, and at the other the people have found a way for themselves alongside of the road they used to travel upon. But in both cases the public is equally deprived of the use of the road. It is idle to talk of laying down a railway on the middle of a common country road, and running locomotives and cars over it constantly, without impeding or obstructing the free use of it by the public. The commonest kind of common sense forbids us to believe that such a thing is at all possible. On the broad streets of Erie—Twelfth Street is one hundred feet wide—it may be done. The clearest evidence of this being an obstruction is found in the fact that no man does use the road as formerly at the place in question. It is true that the travelled way is not far distant, and for ought we know it may be just as good and commodious. But it runs for the most part over private property which may be fenced up any day in the year. We say again that the defendants must govern themselves by the law and not by their notions of public interest. The decree commanded them to take up and remove all that part of their railroad which lies on the bed of the Buffalo road, and they must obey it.

> DECREE.—And now to wit: Nov. 2, 1854, at the present term come the defendants by their counsel, and after due notice present to the court plans and specifications for a proposed alteration of the route and location of their road so as to enter the borough of Erie as the same was in 1842, at Twelfth Street, along the course designated in said plan, which is placed on file. And the said defendants also present a plan for a proposed change of the route and location of their road where it interferes with the free use of the Buffalo road at Harbour Creek, as designated in a plan on file—which said plans were excepted to on the part of the Commonwealth and argued by counsel, and the exceptions and arguments of counsel being heard, and the court fully advised in the premises, the court do find the plans and specifications first mentioned, the change in the route and location of said road at the borough of Erie, to be in conformity with the charter of defendants, and the decree of this court heretofore made, and do approve the same.

> And the court find the plan of the proposed change at Harbour Creek, where it occupies 800 feet of the Buffalo road, not to be in conformity with the charter of defendants and the decree of the court, and do disapprove the same, approving it in other respects. By the Court.

LEWIS, J.—In order that I may not be misunderstood, I proceed to state the reasons which induce me to concur in the final decree about to be entered in this cause.

When a municipal corporation is made the terminus of a rail-

road, it is not like a tree, a rock, or any other object not liable to any material change, either under the laws of nature or the laws of man.　It is more like a river, whose boundaries are changed by accretion and detrition.　The rapid increase of population so frequently demands an extension of the boundaries of cities and towns, that such alterations are deemed to lie in the contemplation of the legislature when making enactments, and of individuals when transacting business in relation to them.　This is the rule in England, and it is one which applies, with peculiar propriety, to a new country like our own.　A contract with a city or borough may be enforced against it, notwithstanding a subsequent change of its boundaries: 3 *S. & R.* 127.　Where new territory is added, the old and the new portions are liable, under the corporate name, for all obligations which existed before; and, having discharged them, the respective portions are left to settle the equities of the case afterwards, between themselves.　The ordinances of a borough or city are always made with reference to the boundaries which may exist at the time any act may be done which is supposed to come under their operation.　Who can doubt that an ordinance, passed before the boundaries of Erie were extended, prohibiting nuisances in the highways, would, by the mere act of extension of the borough limits, be fully operative over every highway within the enlarged boundary of the corporation?　When a corporation accepts a new charter it retains its possessions, recovers its debts, and is bound by its liabilities, as existing before the change: 1 *Saund.* 344, note 1.　The London and Southampton railway act directs that where a bridge shall be erected for the purpose of carrying any turnpike road over or across the railway, the ascent to such bridge shall not be more than one foot in 30 feet, except where the "*present inclination*" of such turnpike shall be steeper.　In the construction of this statute, it was held, that the expression, "present inclination," is to be referred to the inclination of a road *at the time when taken by the company*, and *not at the time when the Act of Parliament was passed.*　See Attorney-General *v.* The London and Southampton Railway Company, 1 *Railway Cases* 283.　When an Act of Parliament, which was passed in 1840, prohibited the erection of any turnpike gate in the town of Taunton, it was decided by the Queen's Bench that the word "*town*" referred to the boundaries existing *at the time the gate was erected*, or *continued*, and *not to the boundaries existing at the time the act was passed.*　It was declared that "if a new gate is to be erected in 1870, the trustees were bound to consider whether the road is *then* within the limits of the town of Taunton, not whether it was so thirty years before:" Regina *v.* Cottle, 16 *Adol. & Ellis, N. S.;* 71 *Eng. Com. Law R.* 412.　It is conceded, and has been decided by this court, in the interlocutory decree already made in this cause, that where a city or bor-

[Commonwealth *v.* Erie and North-East Railroad Company.]

ough is made the terminus of a railroad, the whole territory within the municipal limits must be regarded as a single point, and that the terminus may therefore be established at any spot within the limits thus prescribed, according to the discretion of the company. An extension of the boundaries of the municipality is, therefore, nothing more than an enlargement of the discretionary powers of the railroad company, and cannot possibly be a violation of its chartered rights. Even if it were so, it is clear that none but the railroad company itself could complain of it. But in this case the company made no complaint. It took the Commonwealth at her word, and established the terminus within the new boundaries. This, in my opinion, was in exact accordance with the true construction of the statute, as settled by repeated adjudications. But were it otherwise, the state has acquiesced in the location, until the company has fully completed its work, and has expended large sums of money in the construction of the railroad, and in the erection of the necessary buildings for the depot. The road was in full operation, in connexion with another road running west, establishing an extensive line of railway communication from the East to the West, long before any objection was made by the Commonwealth. In addition to this, it should be remembered that the railroad company was bound, under pain of forfeiting its charter, to complete its road within a specified time. That time had expired before this bill was filed. It is now too late to relocate the road, and reconstruct it, so as to save the forfeiture; and the counsel for the Commonwealth plainly intimates a determination to take advantage of the forfeiture, unless the new location shall be so satisfactory as to induce her to waive it. The long acquiescence of the state, with full knowledge of her rights, in this large expenditure of money, made in good faith, precludes her from making objections to the location. This principle applies with irresistible force, wherever it is necessary, in order to save a forfeiture. Forfeitures are, in general, so odious, that courts of justice seize upon slight circumstances of acquiescence for the purpose of relieving against them. But there are positive acts of the state, in addition to her mere acquiescence, which preclude her from making objections to the location of the road at Erie. The Franklin Canal Railroad was connected with the Erie and North-East Railroad, at the very point now objected to, at the time the state seized and took into possession the former road. Instead of repudiating that connexion as illegal, the legislature expressly directed the governor to " Keep it in repair and good running order, for the accommodation of the public travel and business." This was done, and the state herself made use of the Western railroad, and derived revenues from its connexion with the other road, at the very point now complained of. This is not all: By an act of last session, the Franklin Canal Railroad has been

[Commonwealth v. Erie and North-East Railroad Company.]

sold for a large price by the state herself, to the Cleveland, Paines-ville and Ashtabula Railroad Company. It was the very connexion now complained of that gave the Franklin Canal Railroad its chief and almost only value. Without that connexion no such price could have been obtained for it. The sale was made without the slightest intimation in the act authorizing it, that any change was to be made in the Eastern railroad at the point of connexion. On the contrary, there was much in the act to encourage the belief that this connexion, as existing and in use at the time of the sale, was not to be disturbed. Upon the plain principles of common honesty, the Commonwealth ought not now to destroy the value of her own grant, and to deprive her own grantee of the consideration for which a large sum of money has been paid. But apart from the mere justice of the case, the act of the state, in making this sale, has a *legal* effect which should certainly bind her. The connexion between two railroads is an act which requires the concurrence of both. When a statute authorizes one company to connect with another, the authority, although in different degrees, is necessarily conferred upon both. One is to do—the other to suffer; one is active—the other passive. The sovereign, having authority over both, by ratifying the connexion as to the first, necessarily confirms it as to the last. There is no escape from this view of the case. The legislation of last session, in relation to the Western road, and the acts of the state under it, have ratified and confirmed the location of the Erie and North-East Railroad, at the point of connexion. For these reasons I was opposed to the decree which directed that part of the railroad to be broken up and reconstructed, so as to terminate within the limits of the borough of Erie, as they existed in 1842. The question now is not whether the proposed location is the most advantageous one for the interests of the city of Erie, the company, or the public, but whether it is within the powers of the company, as expounded by a majority of this court. There is no room for doubt on this subject. It is in accordance with the decree, and we have no right to exact more. A railway company has no right to act capriciously, to the injury of others; but where this is not the case, its charter constitutes it the judge of the most convenient mode of conducting its works : The London and Birmingham Railway Co. v. The Grand Junction Canal Co., 1 *Railway Cases* 224.

I come now to the alteration proposed to be made at Harbour Creek. The power to construct a railroad involves every power necessary to accomplish the object. In a country where public highways abound, it might be impossible to avoid crossing them. It necessarily follows that the company has the right to cross them, where they lie in the route of the railroad, doing as little injury as possible, consistent with the legitimate use of the latter. When the superior advantages of railroads are considered, and their capacity

to promote " the greatest good of the greatest number" is taken into view, it is plain that the limited travel on the ordinary roads ought to make some sacrifices for the advancement of an object of such extensive and paramount benefit to the community. It has been repeatedly decided that a railroad on a public street is not a nuisance *per se*. The inconveniences which it occasions are but the natural results of increased commerce and travel. The more a thoroughfare is used for its legitimate purposes, the greater may be the inconveniences to those who have occasion to use it. But while each is so using his privilege as not unnecessarily to annoy others, there is no legal injury to any one, and therefore no legal ground of complaint. The right to cross a public road in the construction of a railroad, is as clear as the right to construct the railroad itself. The angle at which it crosses must necessarily depend upon circumstances. It is certainly not restricted to a right angle where this would require dangerous curves. Short curves in a railroad interfere with that velocity which is the main object of this description of improvement. They also endanger the lives of passengers on the ordinary roads, as well as those in the railroad cars. It is therefore of primary importance that the line of the railroad be straight. This paramount object ought to be secured, if possible, although in doing it the common roads may be crossed repeatedly, and at various angles, or even approached so near as to alarm the horses and cattle in sections of country unused to the noise of the locomotive, or to the grand and imposing spectacle of a long train of cars, filled with thousands of human beings, or freighted with many hundred tons of merchandise, whizzing past them with almost lightning speed. The idea that a railroad must be made crooked in order to avoid proximity to, or crossing an ordinary road, is one which would embarrass and impair the usefulness of this, the greatest improvement in commercial intercourse which the world ever saw. It places an object of minor importance above that which, in its tendency to promote the general benefit, is so far superior as to be altogether inestimable. It places ignorance above science, indolence above enterprise, and the minority above the majority. It is of close kindred with the doctrine that the owners of the adjacent lands have a right to pasture their cattle on the railroad track, and to compel the engineers and conductors to stop a long train of cars while they endeavour, by means of sticks, clods, and stones, to drive off, and keep off the cattle long enough for the train to pass in safety.

I have already said that the power granted to the railroad company to construct its road between the points designated in its charter, gives it the right to cross every other road that lies in its route. It has therefore a right to cross the Buffalo road, or to run in proximity to it. In doing so it is bound to so use its privilege as not *unnecessarily* to interfere with the public highway. It

has a right to a straight line, free from unnecessary curves, elevations, and depressions. If these must exist in one or the other of the two lines of communication, common sense and the general interest of the community require that they should exist in the ordinary highway rather than in the railroad. The *duty* to do as little damage to the common highway as possible, consistent with the fair uses of the railroad, carries with it the *power to do such acts as are absolutely necessary to avoid such damage*. If the common road can be crossed *at grade*, the body of it must be so altered and constructed as to make the crossing as convenient as possible for wagons, carriages, &c. If the railroad crosses at an elevation too great for this, the common road *may be raised to a reasonable degree by embankment, and a bridge substituted for the road;* or it may be depressed so as to admit of a passage under the railroad. In both of these cases the site of the road is necessarily changed, and the power to make the change has never been denied. It results from the duty imposed. It is true that these alterations in the site of the highway are *vertical* ones. But there is no difference in principle between a *vertical* and a *lateral* alteration. A change in a *horizontal direction* is as fully authorized as one in *a direction perpendicular to the horizon.* They both stand precisely upon the same principle. It follows, therefore, that where the necessities of the case require it, the highway may be removed in a horizontal direction to avoid the obstruction otherwise necessarily created by the railroad. Where the highway is so crooked as to require repeated crossings at inconvenient angles, as appears to be the case with the Buffalo road at Harbour Creek, the right to change its location in a horizontal direction flows from the obligations imposed. In performing this duty the railroad company is bound to purchase the necessary ground, to pay all expenses of construction, and all damages which may be done to private right. No evil can arise from the exercise of this power, which might not be produced by intrusting it to the Quarter Sessions; or, as is the case in some counties, to road commissioners under special acts. All inferior tribunals are subject to the review and control of the Supreme Court, and the railroad corporations of the Commonwealth are expressly made subject to the "supervision and control" of the same tribunal. So that if they abuse their power by improperly or unnecessarily changing the location of a public highway, or by the defective reconstruction of it when changed, an ample remedy has been provided by law. The final confirmation of the road, as changed, is decided by the same power that finally establishes the location of all other public highways, by whomsoever laid out.

In England the railway companies under the Consolidation Act of 1845, and under various other statutes, constantly exercise this power. No evil has been found to flow from it. The science, ex-

[Commonwealth *v.* Erie and North-East Railroad Company.]

perience, and force at command of these companies point them out as peculiarly well qualified for the trust; and the official supervision existing there, as well as here, sufficiently secures the public against any abuse in exercising the authority.

But in this case, even if any doubts existed in regard to the original right of the company to make the change at Harbour Creek, considerations have supervened which ought to weigh strongly with the court in deciding upon that part of the case. The company appears to have acted in good faith under the belief that its acts were authorized by law. It has, so far as I am able to judge, substituted a more convenient road for the one which has been interfered with by the railroad. A large expenditure of money has been made in the construction of one of the best and most extensively useful railroads in the Union. During the time that the company was expending its money in the reconstruction of the Buffalo road, and in the construction of the railroad, the Commonwealth interposed no objection, and the public have adopted and are travelling over the new highway. There has been a long acquiescence in the action of the railroad company. The unauthorized and irregular proceedings of the excited population, in destroying the railroad structures, cannot be regarded as protests by the Commonwealth, which take away the effect of her silence and acquiescence. It has been properly said that, in deciding this case, we are not to look at the action of the local population, or of their authorities, but at *the flag under which they are now making battle.* They are in the field under the banner of the Commonwealth, and the rights of the state are the only rights which she can enforce in the present proceeding. The assent of individuals, or even local authorities, cannot legalize, nor their dissent invalidate, the location of the railroad.

If the railroad has not been constructed with as little injury to the highway as possible, this is a substantial ground of complaint which the court should stand ready to redress with promptness and energy. But if the Commonwealth merely complains of a defect of authority in the company to change the site of the highway, and desires on that ground to break up the railroad, although the change has made the public road better than it was before, she is too late. Such an application, on mere technical grounds, could not be granted after such a long acquiesence, and so much money expended, without objection, and in good faith : 1 *Railway Cases* 436 ; 18 *Ves.* 515 ; 2 *Dowl. P. C.* 519 ; *Shelford on Railways* 441. But a majority of the judges of this court have taken a different view of this question, and it has been decreed that the railroad must be broken up and reconstructed, so as not to interfere with the Buffalo road at Harbour Creek. The question now is, does the alteration proposed avoid the interference in accordance with the decree ? I think it does. The railroad company has

[Commonwealth v. Erie and North-East Railroad Company.]

been driven by judicial interpretation upon the breakers, and I am unwilling to force it further out of its course than the necessity of the case requires in order to avoid them.   The terminus of the railroad, as well as its location generally, must depend upon the condition of the ground, the demands of trade, and a variety of other considerations, which are not the subjects of judicial cognisance.

I regret most sincerely that a majority of my brethren have thought that the proper construction of the charter requires these inconvenient and dangerous deviations from a straight line, in one of the most extensively travelled railroads on the continent.   But it is clear that we have no authority to control the company further than to confine it within the limits of its charter.   We have therefore no right to deprive its directors of the discretion reposed in them by law; and we cannot compel them to adopt the locations recommended by the authorities of Erie.   On this part of the case I fully concur with the Chief Justice in the opinion just delivered. The result is, that the railroad has been seriously injured, and the company put to great expense, while the citizens of Erie have entirely failed in securing the object of their exertions.   The change of location thus forced upon the company, will produce no advantage whatever to any one, and least of all to the people of Erie.   If this decree could be forgotten, like a judgment in an ordinary personal action, I should feel less mortification at the result.   But, in impairing the usefulness of this great thoroughfare of the western world, we have erected a lasting monument.   Its voice, like the herdsman's call, will reverberate along the hills and valleys after the original sound shall have died away; and the light which it sheds upon railroad science, like that reflected in the evening sky, will remain after the body from which it emanates shall have departed.

Another plan for the location of the road at Harbour Creek was then presented, and an extension of time asked by respondents.

The counsel of the Commonwealth objected, whereupon the court made the following order, 19th December, 1854:—

The defendants in this case having submitted to the court another plan for a change of their railroad, at the place where it interferes with the Buffalo road, it is ordered that the said plan be filed, and seeing no reason to believe that, by this plan, the Buffalo road will be illegally interfered with, or its free use obstructed or impeded, within the meaning of those words as used in the defendants' charter, we approve it.   The said defendants have also, by their counsel, moved for an extension of the term within which the decree required them to complete the change in their work, and we think it reasonable that the time should be extended.   It is,

[Commonwealth *v.* Erie and North-East Railroad Company.]

therefore, ordered that sixty days further time, after the 7th of January next, be allowed the defendants to do the acts and things which the said decree requires them to perform.

This approval of the plan and extension of the time for executing it does not and cannot, in any manner or degree, affect the question whether the right to make the railroad has been forfeited by the fact that it was not properly made within the time mentioned in the charter. If anything in this whole proceeding can have any influence on that question, it was the original decree, and not the orders made at different times concerning the mode of its execution.

KNOX and LOWRIE, Js., dissented.

Several intermediate orders were made at the instance of defendants' counsel for writs of assistance, and suspending of the decree for the removal of the railroad in the city of Erie. The following was then moved by defendants' counsel:—

And now, to wit, May 17th, 1855, it is moved that the time for executing so much of the decrees of this court in reference to that portion of respondents' railroad that lies west of Ash Lane, in the city of Erie, be extended until one month after the argument and discussion in this court upon the bill No. 7, of December Term, 1854: The Cleveland, Painesville and Ashtabula Railroad *v.* The City of Erie *et al.*

21st May, 1855. Motion allowed. KNOX, J., and LOWRIE, J., dissenting.

The following opinion was afterwards filed, delivered by

BLACK, J.—It was thought at first that the decision of the majority on this motion was so simply just and necessary that it might well be left to vindicate itself. But the want of unanimity in the court has convinced some of us that our reasons ought to go on record.

By the decree of November last, the defendants were commanded to change the terminus of their road so as to bring it within the limits of the old borough of Erie, as their charter required. To prevent the new location from creating a new dispute, we ordered that it should be made on plans to be previously approved by the court. When these plans were submitted, the counsel who argued the cause for the Commonwealth appeared before us with plans made out under the direction of the city of Erie, and asked us to approve none else. We could not do this without taking from the defendants the privilege plainly given in the charter of selecting their own location within the prescribed limits. We could not, and of course we did not, appoint the city councils to act as directors of the railroad company, instead of the directors chosen by the stockholders. Nor did we assume the authority to act as directors

ourselves.  The attorney-general had asked us to enforce the laws of the Commonwealth, and had no show of right to ask for anything more.  The law was obeyed by going within the borough. If that was not sufficient to satisfy the people of Erie, it was the fault of those who passed the act of incorporation, and not ours.

A time was fixed by the decree within which the change was to be made.  We were afterwards satisfied by the fullest proof that the time first allowed was not long enough under the circumstances to finish a work of that magnitude: and we extended it.  The further extensions since that time being allowed in the face of a very earnest opposition, and on grounds not at all foreseen at the date of the decree, require a somewhat minute explanation.

The Erie and North-East Railroad, running westward from the New York line, connects at Erie with the railroad built by the Franklin Canal Company, which was forfeited to the Commonwealth and sold to the Cleveland, Painesville and Ashtabula Company.  Without this connexion neither of the roads would, for the present, be able to do the business it was intended for.  Certainly a break would cause an immense loss and very great inconvenience to the proprietors and to the public.  When, therefore, the lower company was about to finish its new track and take up the old one, it became absolutely necessary for both that the upper company should meet the lower at the new terminus.  The Cleveland, Painesville and Ashtabula Company claimed the right to form this connexion under the contract by which it purchased the work from the state.  But the city councils denied that any such right existed.  Here was a most important dispute, involving on the one hand the probable ruin of two railroad companies, and on the other a very great amount of local glory to the town councils. The companies professed to be confident in the legal foundation of their claim.  The very learned and highly respectable counsel for the city candidly admitted before us that the question was doubtful.  And how did the councils propose to settle this doubtful right?  By main force; by the unerring law of the strongest; by the convincing argument of blows and knocks; by the profound logic of pulling down bridges and tearing up rails.  Do they expect us to approve of this?  Not they.  It would surprise them as much as others to find us sanctioning anything of the sort. They know perfectly well that courts of justice were instituted to prevent the necessity of such irregular appeals to brute strength.  The time has gone by when doubtful rights were tried by the ordeal of *battle:* the experience of mankind has demonstrated that the righteous cause and the strong arm are not always on the same side.

We are not denying that a public nuisance may be abated without waiting for its condemnation by a legal tribunal, provided it can be done without endangering the public peace, and provided

[Commonwealth *v.* Erie and North-East Railroad Company.]

also that it be a clear case, and free from all complication with other interests. But where a body of men take it upon themselves to be their own judges and their own executioners in a matter like this, affecting in some degree the trade of the whole country, and where it may turn out after all that the claim of right they are opposing is legal, they ought to know that they are assuming perilous responsibility. Even in a clear case, if the wrong be persisted in under an erroneous belief on the part of the wrongdoer that he has the law with him, an appeal to the judicial authority is the preferable mode of redress, and should be encouraged. The use of physical force as a means of reaching the justice which the law would administer without it, is to be discountenanced in every possible way, for reasons perfectly obvious to all who love order or have any regard for the safety of human rights.

The directors of the Western company have the right to connect with the other, or else they have not. If they have such right, the violent and forcible interference of the city with its exercise is illegal, mischievous, and dangerous to all concerned, in ways which I will not stop here to describe. If the company was wrong, the councils could have demanded justice in the regular way, and waited hopefully for the decision. It might have postponed their triumph a little while, but their superior wisdom would have been vindicated all in good time, and with rather more effect than it can be by any number of bludgeons in the hands of their constabulary force.

It is contended that this violence is justified because it puts the city in a better position, and the company in a worse one, before the court—that if the connexion were once formed the company might plead its expenditure against a bill to change it. No doubt this argument was made in the purest good faith. But a little reflection will satisfy every one that it is not sound. When did a majority of this court—when did any court in the state—ever refuse to bring a corporation within its charter? When did we fail to give the benefit of every doubtful word to the public? When did we hold that a wrong was sanctified by the money expended in its perpetration? I think we may safely assure the city councils that their mode of conducting hostilities has neither diminished the ultimate chances of their adversaries nor increased their own claim to peculiar favour.

But it was our duty to deal with the matter as we found it; and so we did. When the Western company filed their bill in this court and moved for a preliminary injunction to restrain the city authorities and their adherents from the violence used and threatened, we could not grant it nor consider the merits of the question between them, for reasons which were then fully stated and need not now be repeated. We were obliged to leave the par-

[Commonwealth v. Erie and North-East Railroad Company.]

ties in their original attitude, the plaintiffs claiming what they asserted to be a clear right under a contract with the state, and the defendants asserting that it was doubtful, and avowing their determination to prevent its exercise by force. Meanwhile the time allowed for the execution of the decree against the Eastern company, was running rapidly out. When that company should be compelled to take up its old track and run exclusively to its new terminus within the borough, the break so disastrous to both would necessarily take place. It was thus that mere physical strength was about to defeat what might be a legal right for aught we could then know. In the best aspect, it was anticipating the decision of the proper judicial authorities. Considerations which we could not disregard without setting a precedent which we deemed dangerous in another way, made us powerless to restrain the councils and their adherents by any direct interference between them and the Western company. Then it was that the simple plan was suggested from the bench of extending the time allowed the Eastern company to change its track. This at least was within our power. If the new connexion must be prevented by force, the old one might be preserved by law until the rights of the parties could be ascertained and determined.

A motion to that effect was made by the counsel of the companies. It was opposed not only with ability but with some ardour.

The city of Erie and its representatives were not content that there should be any connexion at all. It seemed a part of their specific object to do the companies as much mischief as possible, while the questions between them were still *sub judice* and the right unsettled. Perhaps this was natural in men whose passions had been heated by a long and fierce contest in which they had suffered some wrongs. But it was not for us to gratify them.

When a bill in equity is filed, it becomes the unquestioned right and plain duty of the court to keep the subject-matter of the dispute as nearly as possible in *statu quo*. Here the important matter was the connexion of the roads. We found the two companies in the possession of a continuous railroad. The object of one party was to break it up—that of the other was to preserve it. Which had the right it was impossible for us to say before a final hearing. Until then we simply let it stand as it is. In due time it will be broken, if an Act of Assembly cannot be produced giving the right in plain terms. Otherwise the company will be protected, as it ought to be.

Against this course two points were pressed in the argument:—
1. That we had no authority to relieve the Cleveland, Painesville and Ashtabula Railroad Company, by making an order in another case against the Erie and North-East Railroad Company. 2. A part of the latter company's railroad being pronounced illegal

[Commonwealth *v.* Erie and North-East Railroad Company.]

and a nuisance, to give time at all for its removal is wrong, improper, and without the sanction of the law.

The first of these propositions is not supported by any authority or precedent. It is not embodied as a rule of practice in any case of procedure that we know of. Nor is there any principle of justice, convenience, or policy which requires us to adopt it. Two railroads are threatened with ruin—it may be undeserved ruin—which ought to be averted at least until their doom is legally pronounced. They are before the court in separate proceedings. Our hands are tied in one case, but in the other we have full power. We are asked to make an order in the latter case, and it is objected to, because it will effectuate the whole purpose too well. The argument in substance is, that we must wrong both for fear that both may be righted. It would be very unfortunate if our consciences could be touched in that way. The more ground the order may cover, the more it commends itself to our best judgment: *Boni judicis est ampliare justitiam.* It is the duty of every judge to make a just decree reach as far as possible, and to give the suitors before him the fullest protection he can in the shortest way that the law has left open. The soundest decisions have done more good incidentally than they have ever done directly.

But it is said that we have no power to give any time whatever for the removal of an illegal railroad. In the opinion of the objecting counsel, we are interfering with the sacred rights of the people if we forbid them to abate a public nuisance whenever they please. If this be true, our whole duty was done in the present case when we ascertained the character of the defendants' railroad. A decree for its removal was not necessary at all. We should have simply fixed the *caput lupinum* on the offending corporation—declared it an outlaw, and left it not to the forbearance of the state, but to the mercy of its private enemies. If we had adopted this view in September last, we would have stopped every car with all the passengers and freight on the road, as soon as our opinion could reach Erie by telegraph. Incalculable loss and injury would have been inflicted on thousands of persons guilty of no offence against the state except that of confiding in her justice and honour. But we were not asked to commit any such wanton and unnecessary outrage on innocent parties. It was conceded all round that we should mould our decree in the manner best calculated to enforce the law at the smallest expense of inconvenience and hardship. We allowed what time we thought reasonable under the circumstances then existing, without hearing of this objection. Afterwards, when other facts were brought to our notice, we gave more, and still the idea that we were exceeding our power had not risen to the dignity of a doubt. Now, however, it takes upon itself all the state of an argument.

[Commonwealth *v.* Erie and North-East Railroad Company.]

We *have* the power. Those who deny it forget that the Commonwealth, by the act of filing the bill, placed the railroad under our immediate protection, to guard the rights of all parties in interest, as well as to enforce their obligations. When a public nuisance has become the subject of judicial investigation, the power of a private citizen to remove it is gone. After that no man may touch it with the hand of violence, except in the way and at the time directed by the court having cognisance of the subject. This principle is constantly acted upon by every court of equity in the world. Two years ago it was announced by ourselves with entire unanimity; and obedience to it was enforced against the same parties who now again claim the privilege of disregarding it.

When it was regularly made to appear that the corporators of the Erie and North-East Railroad Company had violated their charter, we spoke of their acts in the strong terms of reprobation which we thought they deserved. But that decision is not authority for refusing justice to them, or to another railroad company, when they happen to be right. Having once judged them according to the law, it does not follow that we must now command them to be smitten against the law. But the councils of Erie appear to be possessed of the notion that we are ready for anything they may demand. The call upon us to locate the terminus at the harbour, when the opinion was scarcely dry in which we had decided it to be legal anywhere within the borough, was bold enough. Yet it surprises us still more to be told that we have lost, by our own decree, the power to say when or how it shall be executed; that we must disgrace the equity jurisprudence of the state by admitting that it cannot or will not provide for the safety of innocent persons, when it strikes at the wrongs of the guilty; and that its justice consists in bringing indiscriminate ruin on all alike.

We order that the execution of the decree against the defendants in this case be suspended until the existence or non-existence of the right to form the connexion be ascertained on the hearing of the bill already filed for that purpose by the other company. Of course, this order will be revoked if the bill be not prosecuted with all due diligence. But we make it with the utmost confidence that it is necessary and proper. It will prevent mischief which, if once committed, could never be repaired; it will leave all parties at the final hearing in the same position they were at the beginning. of the dispute; it will enable us then to do, without difficulty, the justice which might otherwise be impossible; and it will save the councils of Erie, themselves, from the dangerous consequences of their own rash and unadvised behaviour.